## THE GEORGE W. ANDERSON.

(District Court, E. D. Virginia. April 22, 1908.)

MARITIME LIENS—ADVANCES TO MASTER OF DOMESTIC VESSEL—RIGHT TO LIEN.

There is no lien on a domestic vessel for money advanced to the master upon his bare statement that he needed it to pay off the crew, where the lender knew the owners, that they lived in the same state and were entirely responsible, and that they had an agent in the same port, but made no inquiry of either owners or agent, and where the money was not in fact needed nor used for the benefit of the vessel.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Maritime Liens. §§ 29-31, 41-45.]

In Admiralty. Suit to enforce maritime lien.

This libel was filed to recover the sum of $200 advanced by the libelants to the master of the George W. Anderson, while in the port of Norfolk, Va.. in the month of February, 1905; the same being secured, as claimed by the master, to pay the wages of seamen on the schooner. The respondents, the owners of the schooner, insist that the advance was a personal one to the master, and that their vessel, under the circumstances of this case, should not be held responsible therefor, as there was no necessity for the making of such advance, which proper inquiry by the libelants would have shown them. The following is a brief summary of the facts in the case: That the captain of the schooner went to libelants' office, and said he had to have money to pay his crew off, as they were going to give him trouble; that the crew had back pay owing to them; that the money was paid to the captain, who promised to pay it back as soon as he could, he stating to libelants that he had advanced considerable money to get his vessel away from New York, and that Mr. Currie, one of the owners, would not advance any more; also that the captain of the schooner claimed to be part owner of the vessel, and that credit was given to the vessel; that libelants made only the "usual inquiry" as to whether the vessel needed money—that is, "the captain's word"; that they knew the owners of the schooner had an agent in Norfolk, but they did not go to him to make inquiry as to the needs of the vessel; that they knew that Mr. Currie lived in Richmond, although they did not know he was managing owner, but relied on the captain to pay them back, as agent of the vessel; that they had been doing business with the captain of the schooner for 18 or 20 years, and knew who the owner was; that they made no inquiry as to whether there was any freight money due, and that it is usual for towboat men to make advances to vessels that deal with them; that when they towed the vessel here she was leaking, and they put her on the mud to stop the leak. The respondent proved that if the libelants had applied to them for the money, if the vessel needed it, they would have gotten it; that they had credit and the slightest inquiry would have revealed that it was not proper to advance the captain of the schooner money; that this inquiry could have been made of the owner in Richmond, without libelants' going out of their office, by 'phone or telegram; and that libelants' office was next door to the office of the broker or agent of respondent in Norfolk. Respondent also proved that the freight on the cargo of soft coal from Perth Amboy to Norfolk, amounting to $217, was collected by the captain of the schooner; that after receiving this advance from the libelants the captain of the schooner proceeded to New York with the vessel, and after her arrival there the captain telegraphed, in the latter part of March, to the owners of the schooner to send and take charge of the vessel and pay

off the crew, which was done, by paying about the sum of $400—the captain not having accounted for the freight on the coal to Norfolk, nor the cargo to New York, and having disappeared.

Hughes & Little, for libelants.
J. W. Willcox, for respondent.

WADDILL, District Judge. The law governing this case is aptly stated by the Supreme Court of the United States to be that, in case of a lien asserted against a vessel for advances made the master for supplies or repairs in a foreign port, necessity for credit must be presumed, where it appears that the same were ordered by the master, and that they were necessary for the ship when lying in port, unless it be shown that the master had funds, or that the owners had sufficient credit, and that the lender knew those facts, or one of them, or that such facts and circumstances were known to the lender as were sufficient to put him on inquiry, and to show that if he had used due diligence he would have ascertained that the master was not authorized to obtain any such relief on the credit of the vessel. The Lulu, 10 Wall. 192, 19 L. Ed. 906. "The power of the master to raise money while abroad for the necessities of his ship is the most dangerous form in which his authority can be exercised." Henry's Adm. 137, note 1. "The master does not have the power of binding the ship to the payment of maritime interest, if the owner can be consulted, whether he be in the same or a neighboring state, or in another country." 1 Pars. on Ship. & Adm. 142. "The master, for the same reason, has no such power, if he have funds of the owner within his reach, or if he can borrow the money on the personal credit of the owner, or if a consignee be there with funds of the owner, or any agent of the owner." 1 Pars. on Ship. & Adm. 143, 144. "As to domestic vessels, the general rule as to the master's power to bind domestic vessels under state statutes is based on and assimilated to his powers in relation to foreign vessels, although a lesser necessity for credit exists. If the owner is not in the port where the vessel is at the time, his powers are about as discussed above in relation to foreign vessels." Hughes on Maritime Liens; 26 Cyc. 776.

This authority of a master to secure money upon the faith and credit of his vessel is an important one, full of danger, however, to the shipowner, and in the exercise of which, as well on the part of the master as those making the advance to him, good faith and diligence is required. It is easy for a master to perpetrate fraud on his owner, and the facts and circumstances of this case strikingly illustrate the necessity for those doing business with him to show the utmost diligence on their own part, with a view of protecting the rights of the owners and others to be thereby affected. It is true the inference is that credit given to a master is on the faith of the vessel; but if it can be inferred that the master had funds, or the owner had credit, or that those advancing know of these, or knew such facts as should have put them upon inquiry, then such inference does not exist, and the vessel will not be liable for the advance. Here there was the greater reason for the libelants to make full inquiry, the Anderson being a domestic vessel, and in a nearby port to that of

her home, and that of her owners, in the same state. The owners resided at the city of Richmond, were well known and entirely responsible, with a local agent or broker at Norfolk, all of which was known to the libelants; and the libelants, having made the advance in question without proper inquiry, should not be allowed, some two years afterwards, to hold the respondent ship therefor, notwithstanding the fact that they notified the owners of the advance some three months after making the same, after it was discovered that the captain of the schooner had defaulted largely to his owners, not only collecting the freight due on the particular trip to Norfolk, when the advance was made, which to a considerable extent showed there was no necessity for this advance, but also a large amount of freight money for a return voyage to New York, which would have been ample to pay all of the ship's liabilities, if any.

A decree may therefore be entered dismissing the libel.